UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

THOMAS DUANE TRACY,         )
                                      )
           Plaintiff,       )
                                      )
            v.           )       No. 1:20-cv-00496-JPH-TAB
                                      )
WEXFORD OF INDIANA, LLC.,      )
PAUL A. TALBOT,          )
MICHAEL MITCHEFF,        )
ROBERT E. CARTER, JR.,      )
DUSHAN ZATECKY,        )
                                      )
          Defendants.    )

**Order Granting Summary Judgment for Defendants Talbot, Mitcheff and Wexford**

Indiana prisoner Thomas Tracy alleges that Dr. Paul Talbot, Dr. Michael Mitcheff, and Wexford of Indiana, LLC were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. He also alleges that Dr. Talbot retaliated against him in violation of the First Amendment. Defendants have moved for summary judgment.  For the reasons that follow, the Defendants' motion for summary judgment is **GRANTED**.

## I. Summary Judgment Standard

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schools*, 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II. Factual Background

The claims in this lawsuit concern Mr. Tracy's medical care while he was incarcerated at Pendleton Correctional Facility from August 25, 2017, through November 2019. *See* dkt. 36 When Mr. Tracy was transferred to Pendleton, he was receiving multiple medications for various chronic conditions, including diabetes, hypertension, mixed hyperlipidemia, gastroesophageal reflux disease ("GERD"), asthma, and back pain. Dkt. 76-1, pp. 1-6.

### A.  Treatment under Dr. Talbot

Dr. Talbot worked for Wexford of Indiana, LLC, a private company that provided medical services to the Indiana Department of Correction ("IDOC"), at Pendleton during the time relevant

to the complaint. Dkt. 76-3, para. 2. He provided Mr. Tracy with medical care at Pendleton and has reviewed Mr. Tracy's medical records. *Id.* at para. 3.

### 1.   Treatment in 2017

On August 28, 2017, Mr. Tracy had a chronic care appointment with Dr. Talbot. *Id.* at 7-11; dkt. 76-3, para. 6. Mr. Tracy had previously been prescribed Neurontin for a pinched nerve in his lower back caused by a motor vehicle accident in 2001. *Id.* Dr. Talbot submitted a request to authorize several prescription medications, including Neurontin, Claritin, Prilosec, and Flonase. *Id.* Dr. Talbot did not prescribe clonidine for Mr. Tracy's high blood pressure because there was no indication during this initial appointment that clonidine was appropriate. *Id.* Mr. Tracy requested a soft diet for GERD, but Dr. Talbot denied this request because he did not identify a clinical need for a soft diet. *Id.* Dr. Talbot prescribed a diabetic diet and ordered weekly accuchecks. *Id.*

On October 10, 2017, Mr. Tracy had a chronic care appointment with Dr. Talbot. Dkt. 76-1, pp. 12-18; dkt. 76-3, para. 7. Based on Mr. Tracy's report of a sore throat and severe reflux during the visit, Dr. Talbot submitted an outpatient request for Mr. Tracy to be seen by an ear, nose, and throat specialist to evaluate his condition. *Id.*

On October 31, 2017, Dr. Talbot canceled Mr. Tracy's diabetic diet because Mr. Tracy had signed a form refusing this diet. Dkt. 76-1, p. 96; dkt. 76-3, para. 8.

On December 12, 2017, Mr. Tracy complained about pain in his left shoulder and stated that he was not receiving his weekly accuchecks. Dkt. 76-1, pp. 97-102; dkt. 76-3, para. 9. Dr. Talbot reviewed the medical logs, which showed that Mr. Tracy had been refusing the nursing staff's accuchecks. *Id.* Because of his shoulder pain, Mr. Tracy requested a pass to be handcuffed in the front rather than the back. *Id.* Dr. Talbot did not identify any evidence of an injury to

Mr. Tracy's left shoulder. *Id.* Before deciding whether to issue this pass, Dr. Talbot ordered an x-ray of Mr. Tracy's left shoulder and provided a prescription for Tylenol. *Id.*

On December 23, 2017, Mr. Tracy again complained about pain in his left shoulder in nursing sick call, reporting that the pain radiated through his neck and increased when cuffed in the front by custody staff. Dkt. 76-1, pp. 102-105; dkt. 76-3, para. 10. The nurse did not identify any discoloration or physical abnormalities in Mr. Tracy's shoulder and noted that his range of motion within his neck appeared to be normal. *Id.* Mr. Tracy was referred to meet with a physician and provided with ice and cool compresses to use on his shoulder, as needed. *Id.*

### 2.  Treatment in 2018

On January 11, 2018, Dr. Talbot informed Mr. Tracy that his shoulder x-ray returned normal. Dkt. 76-1, pp. 107-12; dkt. 76-3, para. 11. Nevertheless, Dr. Talbot ordered a pass for front-cuffs only through July 2018. Dkt. 76-1, p. 106. Dr. Talbot also informed Mr. Tracy that due to Neurontin diversion issues within the Indiana Department of Correction ("IDOC"), his Neurontin was being discontinued. Dkt. 76-1, pp. 107-12; dkt. 76-3, para. 11. Dr. Talbot recommended that Mr. Tracy try Pamelor as an alternative medication for his nerve pain. *Id.*

On February 6, 2018, Mr. Tracy had an appointment with Dr. Talbot after having several appointments with the nursing staff. Mr. Tracy's blood pressure was taken twice during the appointment because it initially appeared high. Dkt. 76-1, pp. 139-43; dkt. 76-3, para. 12. Mr. Tracy admitted that he had forgotten to take his blood pressure medication earlier that day. *Id.* Mr. Tracy asked to be prescribed Neurontin for his arthritis. *Id.* Dr. Talbot counseled that Neurontin is not used to treat arthritis, as arthritis is typically treated with non-steroidal anti-inflammatory drugs ("NSAID's"), such as ibuprofen or aspirin, and not with nerve pain medications like Neurontin. *Id.* Dr. Talbot has designated evidence that, despite this counseling,

Mr. Tracy refused to try any NSAID's, topical treatments, or nerve pain medications other than Neurontin. *Id.* That left no other appropriate interventions available to Mr. Tracy at that time. *Id.* Dr. Talbot told Mr. Tracy that he could obtain pain medication from the commissary. *Id.*

On February 22, 2018, Mr. Tracy met with Dr. Talbot to discuss concerns about his ongoing sore throat. Dkt. 76-1, pp. 144-47; dkt. 76-3, para. 13.

On February 27, 2018, Mr. Tracy discussed his chronic pain issues with Dr. Talbot. Dkt. 76-1, pp. 148-51; dkt. 76-3, para. 14. Dr. Talbot has designated evidence (which Mr. Tracy appears to dispute, dkt. 102 at 33), that Mr. Tracy had refused Pamelor on nearly 40 occasions since it was prescribed earlier that month. *Id.* Mr. Tracy had not demonstrated an allergy to Pamelor, nor were there documented notes within his medical history to support his theory that he was allergic. *Id.* Mr. Tracy told Dr. Talbot that Pamelor "made him sicker than a dog" and that it exacerbated his GERD. Dkt. 76-1, p. 148; dkt. 102, pp. 31-32. Dr. Talbot ordered a trial of the medication Depakote to treat Mr. Tracy's nerve pain. Dkt. 76-1, pp. 148-51; dkt. 76-3, para. 14.

On April 3, 2018, Dr. Talbot met with Mr. Tracy to address multiple issues, including heartburn, dental issues, his medical diet, and a concern about the dry skin on his heels. Dkt. 76-1, pp. 152-55; dkt. 76-3, para. 15.

On April 17, 2018, following a referral by the nursing staff, Dr. Talbot evaluated sores on the outside of Mr. Tracy's body and the inside of his nose and ordered topical antibiotics. Dkt. 76-1, pp. 156-59; dkt. 76-3, para. 16. In response to concerns about Mr. Tracy's high blood pressure, Dr. Talbot discontinued his prescription for propranolol and began a prescription for metoprolol, an FDA-approved medication that is used to treat high blood pressure. *Id.* Dr. Talbot has designated evidence that Mr. Tracy had been refusing Depakote, so Dr. Talbot discontinued this prescription and ordered Mobic for pain relief. *Id.*

5

On May 1, 2018, after Mr. Tracy reported that he had re-injured his left shoulder, Dr. Talbot evaluated the shoulder and submitted a request for physical therapy to ease his shoulder pain. Dkt. 76-1, pp. 160-68; dkt. 76-3, para. 17. Mr. Tracy also had concerns about several skin issues he was experiencing, and Dr. Talbot told Mr. Tracy that the medical staff would schedule an assessment for his entire body. *Id.*

On May 14, 2018, Dr. Talbot initiated a consult with Mr. Tracy to complete the skin exam as previously discussed. Dr. Talbot did not identify any abscesses, wounds, or drainage. Dkt. 76-1, pp. 169-72; dkt. 76-3, para. 18. It appeared that Mr. Tracy's skin condition had resolved; the exam was normal, and no new orders were put in place. *Id.* Dr. Talbot told Mr. Tracy that he had been approved for physical therapy, although Dr. Talbot did not observe any limitations on Mr. Tracy's activities of daily living or any functional limitations of his left shoulder during this appointment. *Id.*

Mr. Tracy began physical therapy with an onsite provider on May 22, 2018. Dkt. 76-1, pp. 173-75; dkt. 76-3, para. 19.

On June 5, 2018, after a few sessions of physical therapy, Dr. Talbot met with Mr. Tracy, who claimed to have injured his back during an approved exercise. Dkt. 76-1, pp. 176-78; dkt. 76-3, para. 20. Dr. Talbot did not observe any limitations in Mr. Tracy's movement. *Id.* Mr. Tracy did not want to continue taking the previously prescribed Mobic. *Id.* Mr. Tracy considered a prescription for the pain-reliever Trileptal but ultimately refused it. *Id.* Dr. Talbot suspected Mr. Tracy of drug-seeking behavior as Mr. Tracy seemed to reject every available pain medication and only wanted Neurontin. *Id.* Despite this suspicion, Dr. Talbot ordered a one-week prescription of Flexeril, a muscle relaxer used to treat pain and stiffness. *Id.* Dr. Talbot told Mr. Tracy that he could obtain other pain relievers from the commissary. *Id.*

On June 19, 2018, Dr. Talbot and Mr. Tracy met for a chronic care appointment. Dkt. 76-1, pp. 179-85; dkt. 76-3, para. 21.

On July 3, 2018, Dr. Talbot renewed Mr. Tracy's pass for front-cuffs only and ordered topical antibiotics for a mild skin infection. Dkt. 76-1, pp. 187-90; dkt. 76-3, para. 22.

On July 20, 2018, Mr. Tracy met with the onsite physical therapist for a final appointment, where it was noted that no further physical therapy sessions would be scheduled as Mr. Tracy had been educated on his exercises and could manage the program independently. Dkt. 76-1, pp. 191-93; dkt. 76-3, para. 23.

On August 21, 2018, Dr. Talbot met with Mr. Tracy to address several of his concerns, including back pain. Dkt. 76-1, pp. 194-97; dkt. 76-3, para. 24.  Dr. Talbot ordered Tylenol to take as needed for pain and ensured that Mr. Tracy was re-educated on the home-exercise program for his back pain. *Id.*

On September 18, 2018, during a provider visit, Mr. Tracy requested an ice pass and additional pain medication for his back pain. Dkt. 76-1, pp. 198-202; dkt. 76-3, para. 25. Dr. Talbot did not note any limitations of Mr. Tracy's movements and noted his activities of daily living appeared normal. *Id.* However, given Mr. Tracy's complaints of pain, Dr. Talbot ordered an ice permit for thirty days and renewed the front-cuffs pass through October 21, 2018. *Id.* Naproxen was also ordered to address his back pain. *Id.*

Dr. Talbot continued to see Mr. Tracy at chronic care appointments through the end of 2018. Dkt. 76-1, pp. 203-15; dkt. 76-3, para. 26.

### 3.  Treatment in 2019

On January 31, 2019, Dr. Talbot increased Mr. Tracy's dose of Pamelor because Mr. Tracy said that the current dose was not effective. Dkt. 76-1, pp. 216-19; dkt. 76-3, para. 27. As Mr. Tracy

had been dealing with dry skin on his heel, they discussed a treatment plan, but Mr. Tracy refused to let Dr. Talbot photograph the condition to send to the Regional Medical Director for possible further treatment recommendations. *Id.* Dr. Talbot's exam of the heel was benign, showing very few areas of dry skin, no bleeding or wounds, and the skin was intact. *Id.* Dr. Talbot suggested that Mr. Tracy use Petroleum Jelly on his feet twice per week and directed nursing staff to work with custody staff to ensure that Mr. Tracy was brought over to urgent care to receive it. *Id.* According to Mr. Tracy, Dr. Talbot ordered petroleum jelly because Dr. Mitcheff told him that Minerin cream was too expensive. Dkt. 102, pp. 52-53.

On March 5, 2019, Dr. Talbot followed up with Mr. Tracy regarding his back pain. He did not present with any signs of pain during the appointment, and there was no evidence of any fecal or urinary incontinence. Dkt. 76-1, pp. 221-24; dkt. 76-3, para. 28. Nursing staff had provided Mr. Tracy with Tylenol just a few days prior, and Dr. Talbot again increased the dose of Pamelor to maximize his chronic pain relief. *Id.*

On April 8, 2019, Dr. Talbot met with Mr. Tracy to follow-up on his back pain. Dkt. 76-1, pp. 225-29; dkt. 76-3, para. 29. Mr. Tracy stated that the Pamelor was not working and that he wanted to be referred offsite for an MRI. *Id.* Based on Dr. Talbot's exam, an MRI of the lower back was not clinically indicated at that time. *Id.* Dr. Talbot told Mr. Tracy to continue with the home exercise program and to take Tylenol as needed. *Id.* Dr. Talbot discontinued the Pamelor as Mr. Tracy stated it was not effective. *Id.*

On September 10, 2019, Mr. Tracy received a back-support device and an order for insoles for his shoes to alleviate his pain while he moved through the facility. Dkt. 76-1, pp. 230-34; dkt. 76-3, para. 30. Dr. Talbot ordered a combination of Tylenol and Mobic to be taken together for possible synergistic pain relief. *Id.*

On October 1, 2019, Mr. Tracy told Dr. Talbot that he had injured his left knee while getting out of the shower two days earlier, which then prevented him from participating in any back exercises that were part of his home exercise program. Dkt. 76-1, pp. 235-39; dkt. 76-3, para. 31. Mr. Tracy was not wearing his back support device during the appointment. *Id.* His knee exam returned normal with no abnormal findings. *Id.*

On November 5, 2019, Mr. Tracy requested pain medication for the pain that he described as "all over." Dkt. 76-1, pp. 240-43; dkt. 76-3, para. 32. Mr. Tracy's musculoskeletal and neuropathic pain was nonspecific and non-localized. *Id.* Based on his complaints of pain, Dr. Talbot ordered a trial of Keppra as Mr. Tracy continued to state that Pamelor was ineffective. *Id.* There was new medical research suggesting that Keppra provides relief for many patients with a range of pain syndromes, including back pain. Dkt. 76-3, para. 32. Additionally, as Mr. Tracy reported that the previously ordered combination of Mobic and Tylenol was helpful, Dr. Talbot continued the order for both of those medications, as well. *Id.*

Dr. Talbot states that he did not retaliate against Mr. Tracy while Mr. Tracy was under his care. Dkt. 76-3, para. 37. He states that all of his recommendations for treatments, as well as his actual medical treatments, were based on his professional medical judgment and were not motivated by any ill will or malice toward Mr. Tracy for filing grievances. *Id.*

Dr. Talbot opines that Mr. Tracy's complaints of pain were complicated by his medical history, including his history of diabetes. *Id.* at para. 36. Neuropathy is damage or dysfunction of one or more nerves that typically results in numbness, tingling, and muscle weakness, and pain in the affected area. *Id.* Given Mr. Tracy's motor vehicle injury in 2001 and his diabetic neuropathy, Dr. Talbot is not surprised and does not dispute that Mr. Tracy has some degree of discomfort in his back. *Id.*

Dr. Talbot has reviewed Mr. Tracy's medical records and determined that he had an active prescription for blood pressure medication throughout his incarceration at Pendleton. *Id.* at para. 35. He opines that Mr. Tracy's medical records confirm that he did not have an active prescription for the blood pressure medication clonidine when he was transferred to Pendleton. *Id.* Mr. Tracy received one order for clonidine in 2016, but this was a one-time order and not an ongoing prescription. *Id.*

### B.  Dr. Mitcheff

During the time relevant to this lawsuit, Dr. Mitcheff was the Regional Medical Director for Wexford. Dkt. 76-2, para. 2. As the Regional Medical Director, Dr. Mitcheff was responsible for providing leadership in administrative matters, clinical program development, quality management, staff education, and leadership development in the State of Indiana consistent with the corporate objectives and philosophy of Wexford. *Id.*  at para. 3. Dr. Mitcheff worked closely with corporate medical directors and actively engaged in helping to identify and facilitate the solving of all operational and clinical issues for Wexford sites throughout the state of Indiana. *Id.*

Dr. Mitcheff did not regularly meet with prisoners seeking medical care. *Id.* at para. 4. On certain occasions, he did perform procedures and offer in-person second opinions. *Id.* Dr. Mitcheff would regularly communicate with the medical professionals who provided direct care to prisoners, including the onsite medical professionals at Pendleton. *Id.* at para. 5.

Dr. Mitcheff never received any requests for Mr. Tracy to receive offsite medical treatment for his back pain and thus did not deny Mr. Tracy any offsite care for his back pain. *Id.* at para. 12. Dr. Mitcheff did not meet with Mr. Tracy or provide him with any direct treatment while he was incarcerated at Pendleton. *Id.* at para. 14.

Dr. Mitcheff has reviewed Mr. Tracy's medical records from his time at Pendleton. *Id.* at para. 6. Based on this review, Dr. Mitcheff states that Mr. Tracy had several active prescriptions when he arrived at Pendleton, including aspirin, Cozaar, propranolol, Lipitor, Neurontin, Claritin, Prilosec, Aldactone, and hydrochlorothiazide. *Id.* at para. 8.

Dr. Mitcheff agrees with Dr. Talbot that Mr. Tracy did not have an active prescription for clonidine when he arrived at Pendleton. *Id.* Clonidine is typically used as a last-resort medication due to its short half-life and rapid swings in blood pressure if a dosage is missed. *Id.* at para. 13. It is also very sedating. *Id.* Dr. Mitcheff opines that the Mr. Tracy's medical records show that he received appropriate care for hypertension while he was at Pendleton. *Id.*

Dr. Mitcheff notes that Mr. Tracy did have an active prescription for Neurontin when he arrived at Pendleton, but that this prescription was later discontinued. *Id.* at para. 9. He states that Neurontin is an epileptic drug commonly used to treat chronic pain. *Id.* Like other powerful pain relief prescriptions, Neurontin can be habit-forming. *Id.* It is commonly trafficked within IDOC, and the decision to terminate this prescription for many prisoners was based on the risks involved in taking the medication improperly. *Id.*

Dr. Mitcheff opines that because of Mr. Tracy's previous accidents and injuries, as well as his various medical comorbidities, it is likely that he will always experience some level of back pain. *Id.* at para. 12. He opines that the pain medications Mr. Tracy received at Pendleton, as well as his referrals for physical therapy, home exercise program, ice packs, front cuff passes, his back support, and shoe insoles were provided to help manage and alleviate this pain. *Id.* at paras. 12, 15. Dr. Mitcheff opines that the medical care Mr. Tracy received from Pendleton's onsite medical staff was appropriate and met the standard of care, even though he still had some degree of discomfort. *Id.* at para. 16.

### III. Discussion

**A.  Eighth Amendment Claims**

### 1.  Deliberate Indifference Standard

Because Mr. Tracy is a convicted prisoner, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 772, 727-728 (7th Cir. 2016) (en banc). The defendants do not dispute that Mr. Tracy's chronic medical conditions are serious. Dkt. 75, p. 23. Thus, Defendants' motion for summary judgment turns on whether there is designated evidence from which a reasonable jury could conclude that Defendants were deliberately indifferent to Mr. Tracy's chronic medical conditions.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728. A court should

"look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

### 2. Dr. Talbot

Dr. Talbot met with Mr. Tracy for 25 chronic care appointments between August 2017 and November 2019. Dkt. 76-1, pp. 7-18, 97-112, 139-243. He routinely continued Mr. Tracy's prescriptions for a number of medications, including aspirin, Cozaar, propranolol, Lipitor, Neurontin, Claritin, Prilosec, Aldactone, and hydrochlorothiazide. *Id.* When Mr. Tracy's Neurontin prescription was discontinued, Dr. Talbot presented Mr. Tracy with several alternative pain medications, including Tylenol, Pamelor, Depakote, Keppra, Trileptal, Mobic, naproxen, and Flexeril. *Id.* at 107-12, 139-243. He ordered physical therapy for Mr. Tracy and counseled him on his home exercise program. *Id.* at 169. He provided Mr. Tracy with a back support and ice packs. *Id.* at 198-202, 230. He wrote multiple passes for Mr. Tracy to be handcuffed in front of his body rather than behind his back. *Id.* at 106, 186, 198. He ordered x-rays of Mr. Tracy's left shoulder. *Id.* at 97. He evaluated his skin and prescribed topical antibiotics and petroleum jelly. *Id.* at 152-55, 160-72, 187-90. He ordered a diabetic diet, which Mr. Tracy refused to eat. Dkt. 76-1, p. 96; dkt. 76-2, paras. 6, 8. And he submitted a request for an offsite appointment with an ear, nose, and throat specialist. Dkt. 76-1, p. 12. The designated evidence shows that Dr. Talbot based his treatment decisions on his professional medical judgment and provided Mr. Tracy with appropriate care for his high blood pressure, diabetes, GERD, and chronic pain management. Dkt. 76-2, para. 16; dkt. 76-3, para. 37.

The arguments that Mr. Tracy makes in his verified response brief do not undermine that conclusion. Mr. Tracy claims that Dr. Talbot falsified his medical records by forging the nurses' initials, *Id.* at 33-34, but Mr. Tracy does not explain how he knows that the records were forged.

Statements in a verified brief may be considered as evidence, but they must be based on personal knowledge to have evidentiary value. *See Herzog v. Graphic Packaging Intern., Inc.*, 742 F.3d 802, 805 n.1 (7th Cir. 2014) (Affidavits "used to support or oppose a motion for summary judgment must be based on personal knowledge."). Here, Mr. Tracy has not established that he has personal knowledge of the alleged forgery. Mr. Tracy also claims that Dr. Talbot forced him to obtain pain medication from the commissary even though Dr. Talbot knew that Mr. Tracy did not have sufficient funds to access the commissary. *Id.* at 44. But as Dr. Talbot notes in his reply brief, he did not force Mr. Tracy to purchase pain medication from the commissary; he merely reminded Mr. Tracy that the commissary sold pain medication after reviewing several other medication options with Mr. Tracy.[1] *See* dkt. 104, p. 5 (citing dkt. 76-1, pp. 139-43; dkt. 76-3, para. 12).

Mr. Tracy next argues that Dr. Talbot did not exercise sound medical judgment, but he does not designate corresponding evidence. As such, Mr. Tracy's argument is just that—an argument based on his personal beliefs about what medical treatment was appropriate. This does not create any triable issues of fact. *See Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

For example, Mr. Tracy argues that he should have received clonidine for high blood pressure, dkt. 102, pp. 23, 26, but the undisputed evidence is that Mr. Tracy did not have a clonidine prescription when he arrived at Pendleton, that Mr. Tracy' high blood pressure was managed with other medications, and that clonidine is a "last resort" medication that carries

---

[1] To the extent Mr. Tracy argues that he did not refuse to take certain medications that Dr. Talbot recommended, that does not create a genuine issue of material fact that precludes summary judgment. The fact that matters in the context of evaluating Dr. Talbot's motion for summary judgment is that he discussed various alternative medication options with Mr. Tracy, and Mr. Tracy does not dispute this fact.

significant risk factors. Dkt. 76-2, para. 13. Mr. Tracy argues that Dr. Talbot provided him with excessive levels of Mobic and Tylenol, dkt. 102, pp. 35-37, but Mr. Tracy does not designate supporting evidence.  Therefore, his assertion is merely personal opinion and speculation, neither of which creates a genuine issue of material fact. Mr. Tracy also argues that Dr. Talbot provided him with an "ineffective course of treatment" for GERD, dkt. 102, p. 43, but his only specific complaint is that Dr. Talbot refused to order a soft diet, which Dr. Talbot states was not clinically indicated for this condition. Dkt. 76-3, para. 6. Moreover, Dr. Talbot consistently prescribed Prilosec for this condition. Dkt. 76-1, pp. 7-18, 97-112, 139-243.

Mr. Tracy also argues that Dr. Talbot's refusal to order a back x-ray was deliberate indifference. Dkt. 102, p. 62. It is not clear whether Mr. Tracy wanted Dr. Talbot to order an x-ray specifically, or if he would have been satisfied with an MRI or another type of imaging exam. Regardless, Dr. Talbot performed a physical exam and determined that an MRI of Mr. Tracy's back was not clinically indicated. Dkt. 76-1, pp. 225-29; dkt. 76-3, para. 29. As the Seventh Circuit has previously held, "An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411.

Next, Mr. Tracy argues that he should have received Neurontin for his chronic nerve pain, and that no other medication would do. Dkt. 102, pp. 29-30. But that's not evidence from which a jury could reasonably infer that Dr. Talbot was deliberately indifferent. First, Dr. Talbot submitted a non-formulary request to renew Mr. Tracy's Neurontin prescription on August 28, 2017, which resulted in Mr. Tracy receiving Neurontin for an additional 90 days. Dkt. 76-1, p. 78. Second, Neurontin is a strong, habit-forming pain medication, and the decision to discontinue Mr. Tracy's Neurontin prescription arose from concern about diversion of Neurontin within the facility. Dkt. 76-3, para. 10; *see also Lockett v. Bonson*, 937 F.3d 1016, 1024-25 (7th Cir. 2019) (affirming

summary judgment in favor of nurse practitioner who discontinued prisoner's prescription for a strong opioid painkiller in favor of a weaker painkiller to treat pain associated with sickle cell anemia). Finally, Dr. Talbot pursued a variety of alternative methods of managing Mr. Tracy's chronic pain, including various medications (Tylenol, Mobic, Pamelor, Keppra, Trileptal, Depakote, naproxen, and Flexeril), a back support, physical therapy, and home exercises. Given the totality of this care, no jury could reasonably infer that Dr. Talbot was deliberately indifferent to Mr. Tracy's nerve pain. *See Petties*, 836 F.3d at 728 (courts consider the totality of a prisoner's care in considering claims for deliberate indifference); *Pyles*, 771 F.3d at 409 ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment."). The fact that Mr. Tracy may always experience some level of chronic pain, and that his treatment goals include pain management rather than zero pain, does not make his treating physician liable for damages under the Eighth Amendment.

Mr. Tracy also argues that he was removed from his pain medication "cold turkey," "with NO taper down dosage at all." Dkt. 102 at 29–30. There is an issue of fact about whether Mr. Tracy was weaned off Neurontin. His medical records show that he had a prescription for 1600 mg of Neurontin when he arrived at Pendleton in August 2017 until his Neurontin prescription was discontinued in January 2018. *See* dkt. 76-1, pp. 66, 73, 83, 87, 94, 101, 104 (medical records); *but see* dkt. 76-2, para. 9 (Mitcheff affidavit, stating that Mr. Tracy's Neurontin prescription "was titrated and eventually discontinued" in January 2018). But Mr. Tracy's verified response brief does not describe any withdrawal symptoms of Neurontin, much less that Dr. Talbot was aware of any symptoms or was required to taper down the dosage. *See Pulera v. Sarzant*, 966 F.3d 540, 553

16

(7th Cir. 2020). The dispute about whether Mr. Tracy was weaned off Neurontin is therefore immaterial and does not create triable issues of fact.

In sum, Dr. Talbot provided Mr. Tracy with consistent medical care for several chronic conditions for more than two years. There is no evidence showing that he did not base his treatment decisions on his professional medical judgment or that his treatment decisions were so far afield of accepted medical practice that they violated the Eighth Amendment. Mr. Tracy has designated no evidence from which a jury could reasonably infer that Dr. Talbot was deliberately indifferent to Mr. Tracy's serious medical conditions. Accordingly, Dr. Talbot's motion for summary judgment on Mr. Tracy's Eighth Amendment claim is **granted**.

### 3. Dr. Mitcheff

Mr. Tracy did not have any chronic care or other medical appointments with Dr. Mitcheff. There is no evidence that Dr. Mitcheff ever met Mr. Tracy or that he received requests for offsite treatment regarding Mr. Tracy's back pain. Dkt. 76-2, paras. 4, 12, 14. Most of these treatment decisions were made by Dr. Talbot, and Dr. Mitcheff cannot be not liable for medical decisions that he was not responsible for and did not have knowledge of. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (cleaned up).

To the limited extent that Dr. Mitcheff made treatment decisions regarding Mr. Tracy, there is no evidence that those treatment decisions amounted to deliberate indifference.

### i. Ear, Nose, and Throat Specialist

Mr. Tracy argues that he was never seen by an ear, nose, and throat specialist, despite Dr. Talbot's request for offsite medical care on October 10, 2017, "because of Wexford's policy of 'collegial review' having to be reviewed and approved by Regional Medical Director Dr. Michael

Mitcheff." Dkt. 102, p. 42. There is no documentary evidence that Dr. Mitcheff denied Mr. Talbot's request for Mr. Tracy to see an ear, nose, and throat specialist. *See generally*, dkt. 76-1 (medical records). Mr. Tracy has never spoken to Dr. Mitcheff, and Mr. Tracy has not established that he has personal knowledge about whether Dr. Mitcheff denied this offsite medical request. Mr. Tracy's verified statement accusing Dr. Mitcheff's of denying the offsite medical request is not admissible evidence because he has not shown that the statement is based on his personal knowledge. *See* Fed. R. Civ. P. 56(c)(4). There is no evidence that Dr. Mitcheff was personally involved in any decision to deny Mr. Tracy an appointment with an ear, nose, and throat specialist so he cannot be liable for that decision.

### ii.   Cracked Skin on Feet

Mr. Tracy alleges that Dr. Mitcheff denied his prescription for Minerin cream to treat cracked skin on his feet and ordered foot soaks and petroleum jelly as an alternative treatment. Dkt. 102, pp. 52-53. Again, there is no documentary evidence that Dr. Mitcheff took this action. The medical record that Mr. Tracy cites to, "MR-577" has not been designated as evidence, and Mr. Tracy has not established a basis for personal knowledge about Dr. Mitcheff's alleged involvement in denying Minerin cream. *See* dkt. 76-1 (medical records; Bates stamp numbering ends at MR-492).

Mr. Tracy states that Dr. Talbot told him that Dr. Mitcheff would not renew his order for Minerin cream because it was too expensive. Dkt. 102, pp. 51-52. Even if Dr. Talbot's out of court statement were admissible—rather than inadmissible hearsay—there is no evidence that ordering this alternate treatment amounted to deliberate indifference. The fact that petroleum jelly may have been less expensive than Minerin cream does not mean it was less effective at treating Mr. Tracy's cracked skin or that it was a constitutionally deficient form of treatment. Further, there is no

evidence that the alternative treatment was ineffective or that Dr. Mitcheff knew it was ineffective at the time the alternative treatment was ordered. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("courts may consider the cost of treatment alternative when determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective.") (cleaned up).

To summarize, Dr. Mitcheff is not liable for medical care he did not provide and was not responsible for providing. The fact that he was Wexford's Regional Medical Director, without more, does not make him responsible for the treatment decisions of Dr. Talbot or other members of the medical staff. The only evidence of his involvement in Mr. Tracy's medical care at Pendleton involves his alleged refusal to renew Mr. Tracy's prescription for Minerin cream to treat cracked skin. But even then, there is no evidence that the alternative treatment Dr. Mitcheff allegedly ordered, petroleum jelly, arose from a deliberate indifference to Mr. Tracy's serious medical need. Accordingly, Dr. Mitcheff's motion for summary judgment is **granted**.

### 4. Wexford

Mr. Tracy is proceeding against Wexford under the theory set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To prevail, Mr. Tracy must show that he was deprived of constitutionally adequate medical care as a direct result of a Wexford policy or custom and that Wexford "took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 236 (7th Cir. 2021).

Mr. Tracy has not designated evidence of a specific Wexford policy or custom that caused him to suffer a constitutional deprivation. In his verified response brief, Mr. Tracy argues that Wexford has a policy or custom of understaffing Pendleton. Dkt. 102, p. 118. There are two problems with this argument. First, there is no evidence that Wexford failed to adequately staff

Pendleton during the time relevant to this lawsuit. Second, Mr. Tracy's lawsuit presents allegations about treatment decisions—including the decision to terminate his Neurontin prescription, the decision to deny his request for a soft diet, and the decision to manage his high blood pressure with medications other than clonidine. Even if Mr. Tracy had presented evidence of understaffing, he has not shown a connection between understaffing and these treatment decisions. *See Dean*, 18 F. 4th 214 at 236.

Mr. Tracy also argues that he was never seen by an ear, nose, and throat specialist, despite Dr. Talbot's request for offsite medical care on October 10, 2017, "because of Wexford's policy of 'collegial review' having to be reviewed and approved by Regional Medical Director Dr. Michael Mitcheff." Dkt. 102, p. 42.

As explained above, Mr. Tracy has not established that he has personal knowledge about the circumstances under which the offsite medical request was denied. *Supra* at 17-18. Further, the evidence does not explain the nature of the collegial review process, and nothing suggests that the collegial review process is facially unconstitutional. *Cf. Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 659 (7th Cir. 2021) (holding in a case involving an Illinois prisoner that Wexford has a collegial review process that is not facially unconstitutional). When the policy at issue is not unconstitutional on its face, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the [corporation], and the causal connection between the 'policy' and the constitutional deprivation." *Dean*, 18 F. 4th at 236 (emphasis removed) (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality)). Mr. Tracy has not presented any evidence other than his personal opinion that the collegial review process resulted in the denial of any offsite medical treatment. Thus, the evidence does not support a reasonable conclusion that Wexford maintains a collegial review process, that the process has

caused widespread constitutional violations, and that the process caused Mr. Tracy to receive constitutionally inadequate medical care. Accordingly, Wexford's motion for summary judgment is **GRANTED**.

### B.  First Amendment Claim

Mr. Tracy claims that Dr. Talbot withheld, denied, delayed, or changed his medications; denied necessary medical evaluations; and denied his requests for outside referrals to retaliate against him for filing grievances about his medical care. Dkt. 36, p. 2.

Courts apply a burden-shifting analysis to determine whether there is a triable issue of fact on First Amendment retaliation claims. *Bless v. Cook County Sheriff's Office*, 9 4th 565, 571 (7th Cir. 2021). To make a *prima facie* case of retaliation, Mr. Tracy must demonstrate (1) that he engaged in a protected First Amendment activity; (2) that he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) that the First Amendment activity was at least a motivating factor in Dr. Talbot's decision to take the adverse action. *Id.* If Mr. Tracy can establish a *prima facie* case, the burden would then shift to Dr. Talbot to set forth a non-retaliatory basis for the adverse action. *Id.* at 573. Then, the burden would shift back to Mr. Tracy to show that Dr. Talbot's proffered basis for the adverse action was a pretext, or a "phony excuse," that is unworthy of credence. *Id.* If Mr. Tracy can present evidence that would allow a reasonable factfinder to conclude that Dr. Talbot's purported non-retaliatory basis was a pretext, Mr. Tracy's retaliation claim would survive summary judgment and proceed to trial. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Mr. Tracy has not established a *prima facie* case of retaliation because he has not presented evidence that Dr. Talbot's treatment decisions were motivated by retaliation. Evidence that First Amendment activity was a "motivating factor" for an adverse action "may include suspicious

timing, ambiguous statements, behavior, or comments directed at other[s] . . . in the protected group." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). But "suspicious timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Id.* at 681.

Mr. Tracy's grievance records have not been designated as evidence, and his verified response brief does not provide the dates on which he submitted these grievances. Thus, the dates of these grievances are not established in the summary judgment record. There is no evidence that any of Dr. Talbot's specific medical decisions were made after, rather than before, Mr. Tracy submitted his grievances. Thus, Mr. Tracy's argument in his verified response brief that Dr. Talbot was motived by retaliation when he prescribed Pamelor and Mobic, *see* dkt. 102, pp. 31-32, 35-36, is not supported by the evidence. *Cf. Streckenbach v. Meisner*, 768 F. App'x 565 (7th Cir. 2019) (rejecting a prisoner-plaintiff's argument in a retaliation lawsuit that the defendant "must have learned about his lawsuit because the prison is a small place and word gets around" because "neither speculation nor suspicious timing—without more—is enough to survive summary judgment").

The verified response brief references a conversation that occurred between Dr. Talbot and Mr. Tracy about the discontinuation of Mr. Tracy's Minerin cream. During this conversation, Dr. Talbot allegedly referred to Mr. Tracy's grievances and lawsuits. According to Mr. Tracy, Dr. Talbot told him that he could "file another grievance" or "file another lawsuit" if he was dissatisfied with the decision not to renew his Minerin cream prescription. Dkt. 102, p. 52, para. 58. But this statement from Dr. Talbot does not tend to prove that he refused to renew Mr. Tracy's prescription for Minerin cream in retaliation for past lawsuits or grievances, as Mr. Tracy claims

that Dr. Talbot *did* seek approval to renew this prescription, but that the request was ultimately denied by Dr. Mitcheff. *Id.* at 51-53.

The evidence does not support a reasonable conclusion that Dr. Talbot retaliated against Mr. Tracy for filing grievances, and Dr. Talbot's motion for summary judgment on this claim is **GRANTED**.

## IV. Conclusion

For the reasons explained above, the motion for summary judgment filed by Dr. Mitcheff, Dr. Talbot, and Wexford, dkt. [74], is **granted**.

**SO ORDERED**.

Date: 9/30/2022

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

THOMAS DUANE TRACY
143799
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

All Electronically Registered Counsel